UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CONSTANCE TROTMAN, ANITRA KINCY, and
CLARA LUZ BADIA,

                       Plaintiffs,

        - against -

CITY OF NEW YORK, HUMAN RESOURCES
ADMINISTRATION,

                       Defendant.

------------------------------------------------------------X

07 CV 2306
Judge Pauley

ECF

07 Civ.

COMPLAINT

MAR 19 2007

PLAINTIFFS DEMAND
A TRIAL BY JURY

      Plaintiffs Constance Trotman ("Trotman"), Anitra Kincy ("Kincy"), and Clara Luz Badia ("Badia") (collectively "plaintiffs"), through their attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complain of defendant City of New York, Human Resources Administration ("defendant" or the "HRA") as follows:

## NATURE OF THE ACTION

      1.    Plaintiffs bring this action to remedy sex discrimination in employment, including, but not limited to, sexual harassment and the creation and maintenance of a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A ("Title VII"); the New York State Human Rights Law, Executive Law § 296 et seq. ("Human Rights Law"); and the Administrative Code of the City of New York § 8-107 et seq. ("City Law"). Plaintiffs also bring an action for negligent retention against defendant under the common law of New York State.

243215 v1

2. Plaintiffs seek injunctive and declaratory relief, compensatory damages, and other appropriate legal and equitable relief pursuant to Title VII, the Human Rights Law, the City Law, and the common law of New York State.

## JURISDICTION AND VENUE

3. The Court has jurisdiction under § 705(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3). Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over plaintiffs' claims brought under the Human Rights Law, the City Law, and New York State common law. The events, parties, transactions, and injuries that form the basis of plaintiffs' federal claims are identical to the events, parties, transactions, and injuries that form the basis of plaintiffs' claims arising under the Human Rights Law, the City Law, and the common law of New York State.

4. Plaintiffs have fully complied with the administrative prerequisites to the filing of this action.

5. On or about September 19, 2006, plaintiffs filed charges of discrimination against HRA with the United States Equal Employment Opportunity Commission ("EEOC"), complaining of the unlawful acts alleged herein.

6. On or about January 9, 2007, the EEOC issued to plaintiffs individually a Notice of Right to Sue against respondent the City of New York, Human Resources Administration.

7. As the unlawful employment practices complained of herein occurred within the Southern District of New York and defendant regularly does business within the Southern District of New York, venue is proper in this District pursuant to § 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3).

8. Pursuant to § 8-502(c) of the City Charter, prior to filing this Complaint with the Court, plaintiffs served a copy of the Complaint on the City of New York Commission on Human Rights and on the Corporation Counsel of City of New York.

## PARTIES

9. Plaintiff Trotman is an African-American woman. She has worked with the HRA for approximately six years in the title of Eligibility Specialist II ("ES"). She acquired permanent civil service status in 2000.

10. During Trotman's employment she worked at different HRA locations throughout New York City.

11. In February, 2005, Trotman was assigned to work at the HRA office located at 260 East 161st Street, Bronx, New York (the "161st Location"). Trotman presently works at this location.

12. Plaintiff Badia is an Hispanic woman.

13. Badia has worked with the HRA for thirteen years. She has worked in the titles of ES II and Principal Administrative Assistant I ("PAAI").

14. Badia acquired permanent civil service status in November 1999.

15. Throughout Badia's employment with the HRA, she worked in different locations.

16. On January 31, 2005, Badia was voluntarily re-assigned to work at the 161st Location. Badia currently works at that location.

17. Plaintiff Kincy is an African-American woman. She has worked for the HRA for over four years. She works in the title ES.

18. Kincy acquired permanent civil service status in July 2006.

19. Throughout Kincy's employment with the HRA, she has worked in different locations.

20. On or about March 2005, Kincy was assigned to work at the 161st Location. Kincy presently works at this location.

21. Plaintiffs work Mondays through Fridays, from 8:30 a.m. to 4:30 p.m.

22. Defendant HRA is an agency of the City of New York. HRA is an employer within the meaning of Title VII, the Human Rights Law, and the City Law.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

23. During the relevant period, there were approximately 21 employees employed in the ES title at the 161st Location.

24. At all relevant times, plaintiffs Trotman, Badia, and Kincy worked at the 161st Location.

25. At all relevant times, the following individuals supervised plaintiffs at the 161st Location: Michelle McGee, Linda Williams, Lillian Rivera, Donald Gratz, and Donna Dorr.

26. At all relevant times, Kincy reported to Linda Williams as her direct supervisor.

27. Ms. Cobb was the site manager at the 161st Location.

28. On or about October or November 2005, Serena Reaves-Cain ("Cain") was transferred to the 161st Location as the new site manager. Ms. Cobb was demoted to assistant site manager.

29. Before Cain's arrival, Ms. Cobb told employees that they should be careful around Cain because she has the reputation of orchestrating the firing of employees.

30. Soon after Cain's arrival she called a staff meeting. Trotman, Kincy, and Badia attended the meeting. Cain told the attendees that she is also known as "Hurricane" and that she came from another location where she is well known for taking peoples' jobs. She called herself a "bitch."

31. Kincy was assigned to a work group, along with Trotman and Darlene Pullen. This group was stationed at the back of the office.

32. Within a short time after Cain's arrival, she restructured the work groups. She placed plaintiffs Trotman, Kincy, and Badia and co-worker Orlando Vargas in the same work group and transferred the group to the reception area, immediately in front of her office.

33. Cain, almost on a daily basis from November 2005 to April 2006, touched and caressed plaintiffs in ways that made them feel uncomfortable. She held their hands; caressed the back of their hands; rubbed their shoulders and backs in a sexually suggestive manner; kissed them on the cheeks, foreheads, and necks, and sometimes left red lipstick marks on them. Cain hugged the plaintiffs and pushed her breasts up against their breasts, and used the palm of her hand to spank them on the buttocks.

34. In many ways plaintiffs indicated to Cain that they were uncomfortable when she touched them. Cain continued to touch plaintiffs.

35. In the fall of 2005 Kincy was in charge of the fundraiser for the 8th floor Christmas party. The fundraiser materials were located in Cain's office. On several occasions from

November 2005 to December 2005, Kincy went into Cain's office to retrieve fundraiser materials. On a few occasions Cain rubbed Kincy's shoulders and arms.

36. On numerous occasions from November 2005 to April 2006, Cain held Kincy's hands, interlocked her fingers in Kincy's and rubbed her arms and shoulders. Cain told Kincy that she was gorgeous, complimented her on having nice skin tone, called her a pretty girl.

37. On numerous occasions Cain asked Kincy to hug her. Kincy reluctantly allowed Cain to smother her in a bear hug. Cain pressed herself up against Kincy's body so that their breasts would touch.

38. Cain commented about Kincy's body and that her clothing fitted her body well.

39. On several occasions Cain attempted to place her personal iPod earpiece in Kincy's ear. Kincy pulled away and told her she had to go as she was busy at reception.

40. Kincy allowed Cain to touch her on those occasions because she had not yet attained civil service status and was afraid that Cain would orchestrate to terminate her employment.

41. In March, 2006 Kincy returned from vacation. Cain asked Kincy whether she brought back souvenirs for her from her vacation. Kincy told her no. While Kincy was seated in her chair, Cain hugged Kincy from behind. A few seconds later, Cain walked around to the front of Kincy's chair and leaned forward and hugged Kincy tightly. The back of the office chair in which Kincy was seated bent backward and Cain was on top of Kincy. Cain's breasts were pushed up against Kincy's upper body and Cain's knees touched Kincy's lower body. Kincy had to brace the chair to prevent from toppling over. Kincy told Cain to stop. After several seconds Cain re-

moved herself from on top of Kincy. Some of the co-workers, including Michelle McGee, witnessed this incident.

42.     Some time in April 2006 during the morning Cain kissed Kincy on the left cheek. Cain's red lipstick left two lip marks on Kincy's left cheek. From that day employees called Cain the "Lipstick Bandit."

43.     Upon information and belief, Ms. Williams, a supervisor at the 161st Location, took a picture with her cellular phone of the lipstick mark Cain left on Kincy's cheek.

44.     In December 2005, Cain invited Kincy to visit her at her home. Kincy did not go.

45.     In February or March 2006 Cain used her hand to smack Kincy on her buttocks. Cain said she was giving Kincy a "pow-pow."

46.     In March 2006 Cain asked Kincy to hug her. Kincy refused and Cain insisted and walked over to Kincy and enveloped her in a bear hug, pressing her breasts up against Kincy's breasts. Kincy pulled away from Cain as quickly as she could because she was uncomfortable with Cain touching her. Later than day Cain told Kincy that she was going to give her a "pow-pow". Cain smacked Kincy on her buttocks several times with her open hand. Cain stated on that occasion that "God don't like ugly, but he not too fond of pretty either."

47.     Cain acted inappropriately with other female workers at the 161st Location.

48.     Cain, on numerous occasions from November 2005 to April 2006, told Trotman to "come to momma" and enveloped Trotman in a bear hug.

49. Some time in April 2006, Cain threw herself on top of Trotman while she was seated in her chair. The back of the chair reclined and straightened out and Cain laid on top of Trotman. Trotman jumped up out of the chair and Cain almost fell to the ground.

50. In March 2006, Cain, in the open reception area, grabbed Trotman with one hand and used her free hand to spank her on the buttocks several times. Other employees, including Kincy witnessed the incident.

51. Immediately after Cain "spanked" Trotman, Trotman complained to Ms. Cobb, the assistant site manager, about the incident. Ms. Cobb said she was at a loss for words and did not know what to say or do.

52. Ms. Cobb did not take any action to stop Cain's inappropriate behavior towards the women in the workplace.

53. In January 2006, Cain hugged and kissed Badia, and pushed up her chest against Badia, so that their breasts touched. Cain kissed Badia behind her left ear and left a red lipstick mark on her. Upon information and belief other employees saw the lipstick mark.

54. On that same day Badia complained to her immediate supervisor, Ms. Williams, that Cain kissed her and left a red lipstick on her. Ms. Williams did not say anything and did nothing about Cain's behavior.

55. In March 2006 during discussions for the employee recognition fundraiser, Cain suggested that the employees should be part of a pin-up calendar to be used to auction them off to the highest bidder as a way of raising funds. Plaintiffs told Cain that they were not interested in selling themselves. Over several days Cain persisted and told the plaintiffs that they would make a lot of money. Plaintiffs continued to refuse. Cain insisted that she could obtain a lot of money for

the women, especially for Badia because she is full chested and all Badia would have to do is show some "titties." Cain pulled down Badia's blouse and exposed her breasts.

56. Badia told Ms. Cobb that Cain pulled down her blouse and exposed her breasts. Ms. Cobb did not say or do anything to stop Cain's behavior.

57. Trotman and Kincy complained to Mr. Singleton, assistant to the division director, about Cain's inappropriate behavior.

58. Mr. Singleton told Kincy that she herself should do something to stop Cain because if someone were touching him he would have said something.

59. Mr. Singleton told Trotman that he did not want to get involved and the complainants should leave him out of the whole situation.

60. Mr. Singleton told Trotman and Kincy that he believed that Cain had "issues" surrounding sexually predatory tactics at her prior work location and had been suspended for thirty days and attended counseling for her inappropriate behavior. Kincy and Trotman asked Singleton why Cain was reassigned to the 161st Location if they knew she had such problems. Mr. Singleton said it was not his choice for Cain to work at 161st Location. She was transferred there and he had to accept her.

61. Mr. Singleton made Kincy feel that it was her fault that Cain was behaving inappropriately.

62. Neither Ms. Williams, Cobb nor Ms. Singleton took any steps to stop Cain's inappropriate conduct towards plaintiffs.

63. In April 2006 plaintiffs initiated an internal complaint of sexual harassment against Cain.

64. The internal employee counselor conducted an investigation. The counselor substantiated plaintiffs' allegations against Cain and concluded that Cain behaved inappropriately with plaintiffs and created a hostile work environment in the workplace for these women.

65. Plaintiffs have suffered and continue to suffer severe emotional distress because of defendants' action.

66. Defendant acted with malice and reckless indifference to plaintiffs' rights.

## FIRST CAUSE OF ACTION

67. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 66 of this Complaint with the same force and effect as if set forth herein.

68. By the acts and practices described herein, including but not limited to sexual harassment, the creation and maintenance of a hostile work environment, and ignoring plaintiffs' complaints, defendant discriminated against plaintiffs in the terms and conditions of their employment on the basis of their sex in violation of Title VII.

69. In taking the above-described discriminatory actions, HRA acted with malice and reckless indifference to plaintiffs' rights under Title VII.

70. As a result of HRA's discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

71. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 70 of the Complaint with the same force and effect as if set forth herein.

72. By the acts and practices described herein, including but not limited to sexual harassment, the creation and maintenance of a hostile work environment, and ignoring plaintiffs' complaints, defendant discriminated against plaintiffs in the terms and conditions of their employment based on their sex in violation of the Human Rights Law.

73. As a result of defendant's discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

### THIRD CAUSE OF ACTION

74. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1 through 73 of the Complaint with the same force and effect as if set forth herein.

75. By the acts and practices described herein, including but not limited to sexual harassment, the creation and maintenance of a hostile work environment, and ignoring plaintiffs' complaints, defendant discriminated against plaintiffs in the terms and conditions of their employment based on their sex in violation of the City Law.

76. In taking the above-described discriminatory actions, defendant acted with malice and reckless indifference to plaintiffs' rights under the City Law.

77. As a result of defendant's discriminatory acts, plaintiffs have suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

### FOURTH CAUSE OF ACTION

78. Plaintiffs repeat and reallege each and every allegation in Pragraphs 1 through 77 of the Complaint with the same force and effect as if set forth herein.

79. Defendant has a duty to protect their employees from injury caused by employees who they know or should have known pose a risk of harm to others.

80. Defendant breached this duty by failing to exercise reasonable care to insure that their employees were free from the risk of harm inflicted by Cain.

81. Defendant knew or should have known prior to reassigning Cain to the 161st Location that Cain had exhibited sexually predatory tactics and had sexually harassed other employees.

82. Defendant negligently retained Cain's employment, knowing that she had sexually harassed other employees on prior occasions.

83. Defendant's negligent retention of Cain was the direct and proximate cause of plaintiffs' injuries.

84. As a direct and proximate result of defendant's actions, plaintiffs have suffered and continue to suffer severe emotional distress.

WHEREFORE, plaintiffs respectfully request that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of Title VII, the Human Rights Law, the City Law, and the common law of New York State.

(b) enjoining and permanently restraining these violations of Title VII, the Human Rights Law, the City Law, and the common law of New York State.

(c) directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiffs' employment opportunities;

   (d) directing defendant to place plaintiffs in the positions they would have occupied but for defendant's discriminatory and making them whole for all earnings and other benefits they would have received but for defendant's discriminatory and retaliatory treatment, including, but not limited to, wages, pension, and other lost benefits, and interest thereon;

   (e) directing defendant to pay plaintiffs compensatory damages under 42 U.S.C. § 1981A(b);

   (f) directing defendant pursuant to the Human Rights Law to pay plaintiffs compensatory damages, including damages for emotional distress, humiliation, and pain and suffering and interest thereon;

   (g) directing defendant pursuant to the City Law to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering and interest thereon, and punitive damages;

   (h) awarding plaintiffs the costs of this action, together with reasonable attorneys' fees, as provided by § 706(k) of Title VII, 42 U.S.C. § 2000e-5(k) and by the City Law;

   (i) awarding plaintiffs such interest as allowable by law; and

   (j) granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs demand a trial by jury in this action.

Dated: New York, New York
       March 19, 2007

>VLADECK, WALDMAN, ELIAS
>& ENGELHARD, P.C.
>
>By: _____
>Ivan D. Smith (IS 2659)
>Maureen M. Stampp (MS-8453)
>Attorneys for Plaintiffs
>1501 Broadway, Suite 800
>New York, New York 10036
>(212) 403-7300